FRANK H. KIMBALL *v.* NEW YORK LIFE INSURANCE COMPANY.

October Term, 1921.

Present:  WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

Opinion filed February 13, 1922.

*Life Insurance Policy—Consideration of Evidence on Defendant's Motion for a Directed Verdict—Provisions in Premium Note Favorable to Insurance Company May be Waived by It—What Constitutes Waiver—Question for Jury—Policy Construed Against Insurance Company—Entire Contract to be Construed Together—"Attained Age" for Continued Insurance in Policy Issued on Rated-up Basis—Practical Construction of Contract by Parties—Indorsement on Policy as An Admission—Estoppel—Circumstantial Evidence to Establish Estoppel—Cross-examination as to Effect of Reinstatement of Lapsed Policy on Application of Dividends to Extended Insurance—Cross-examination to Test Knowledge of Expert—Harmless Error—Evidence of No Similar Mistakes Inadmissible to Rebut Estoppel by Reason of Claimed Mistake—Exceptions Not Briefed.*

1. On a motion by defendant for a directed verdict, the evidence must be considered most favorably to plaintiff.

2. A provision in a note taken by a life insurance company, covering part of an overdue premium through non-payment of which a policy had lapsed, that if the note was not paid when due it would not be effective to reinstate the policy, was for the benefit of such company and could be waived by it, notwithstanding the provisions of G. L. 5575.

3. Evidence that the records of a life insurance company and an indorsement made by it on a policy, showed a policy in force

beyond the due date of a note, given the insurance company by insured for part payment of an overdue premium the non-payment of which had caused the policy to lapse at the time the note was delivered, and that the note was not paid when due, *held* to justify an inference by the jury that the insurance company had waived a provision in the note that it would be ineffective to reinstate the policy if not paid when due.

4. A "waiver" is the voluntary relinquishment of some known right, benefit, or advantage, which, except for such waiver, the party would otherwise enjoy.

5. In an action on a life insurance policy, where the evidence showed that a life insurance company had knowledge of its right, under a note given by insured, to treat the policy as no longer in force by reason of non-payment of the note, and there was evidence from which it could be inferred that such right had been waived *held*, that whether the insurance company had waived such right was a question for the jury.

6. In an insurance policy, the language being that of the insurance company, all the conditions and provisions favorable to it are to be construed strictly against it.

7. In an insurance policy, the entire contract is to be construed together for the purpose of giving force and effect to each clause.

8. Where a policy of life insurance provided that the premiums, loans, and surrender values thereof, were on the basis of a rated-up age of 43, which was 17 years in excess of the actual age of insured, but did not limit the provision to premiums paid before the policy lapsed, and continued insurance was included in the surrender values, the "attained age" on which, by the provisions of the policy, the continued insurance was to be computed, was the rated-up age attained by the insured at the time of the default, and not his actual age.

9 Where a life insurance company, in the table of loan and surrender values forming part of a policy, computed the term of continued insurance, to which insured was entitled in the event of default in payment of premiums, on the basis of the rated-up age of insured at time of default, and, also, after the policy had lapsed, placed an indorsement thereon as to the term for which policy would continue in force, computed upon the same basis, and the insured received the policy and no claim was made by either party that the method of computation

employed was. erroneous *held*, that these facts constituted a practical construction by the parties that "attained age" of insured, as used in the policy in relation to continued insurance, meant his rated-up age, not the actual age attained.

10.   The indorsement, by a life insurance company, on a policy issued by it and lapsed for non-payment of a premium, of the term for which the policy would continued in force, is, in effect, an admission, and the beneficiary cannot invoke the doctrine of estoppel against the insurance company when it seeks to establish that such indorsement was made by mistake, where there was no competent evidence that either the beneficiary or insured had been induced by the mistake to act or refrain from action, which, is an essential element of estoppel *in pais.*

11.   Reliance by a beneficiary or the insured under a life insurance policy, on such an indorsement may be proved by circumstantial evidence, where it is of a character that such an inference may be fairly taken therefrom.

12.   In an action against an insurance company on a life insurance policy, where the plaintiff, who was beneficiary under the policy, claimed a waiver by the insurance company of the provisions of a premium note, which the insured failed to pay when due, that if not paid when due it would be ineffective to reinstate the policy, and a witness for the company had testified that because of default in payment of premiums the policy was not entitled to an extra dividend which had been used in computing the term of continued insurance after the default, it was proper cross-examination to inquire what would have been the effect with respect to such extra dividend, had the policy been reinstated by the premium note.

13.   A witness for an insurance company, in an action against it by the beneficiary under a policy, as an expert on the subject of the term of extended insurance on default in payment of premiums, testified that the method used in computing the extended term of the policy in suit was based on erroneous data, and on cross-examination was permitted to testify, over objection that it was immaterial, irrelevant and incompetent, and not because improper cross-examination, as to the terms of extended insurance, excluding a policy loan from the computation. *Held*, that the evidence was competent and a proper method of testing his knowledge of the subject on which he had testified as an expert.

14. In an action on a life insurance policy, where the undisputed evidence showed that unless the insured was entitled to certain dividends, in computing the term of extended insurance after default in payment of a premium note, the policy would have expired prior to the death of insured, cross-examination of a witness for the insurance company tending to show that a cash payment made to the company at the time the premium note was given would have kept the policy in force two months, even if incompetent, was harmless when no claim was made that such further extension would have entitled the insured to the dividends necessary to keep the policy in force until his death.

15. In an action on a life insurance policy, where the insurance company claimed a mistake had been made by it in computing the term of extended insurance to which insured was entitled on default in payment of a premium, evidence, offered by the company to rebut a claimed estoppel, that witness never knew of a similar error having been made by the company, was inadmissible, as a person whose erroneous representations have induced another to act cannot escape liability by showing that he had never made similar erroneous representations to any one else.

16. Exceptions saved on trial, but not briefed, will not be considered.

ACTION OF CONTRACT on a life insurance policy. Answer: That the policy had lapsed by reason of non-payment of premium, and that the term of continued insurance to which insured was entitled under the policy had lapsed prior to his death and that policy was not then in force. Replication: That defendant, having full knowledge for computing term of extended insurance in its possession, had made an indorsement on the policy extending insurance at a reduced amount, to a time beyond the date of insured's death and that the policy was then in force; that by such indorsement the defendant made an election as to the term of extended insurance and waived any different right; and that insured and plaintiff, having relied on such indorsement, the defendant was estopped from claiming that the indorsement was wrong. Rejoinder: That the terms of the policy contract determined the rights and liabilities of parties, and denial of estoppel. Trial by Jury, September Term, 1921, Chittenden

County, *Butler*, J., presiding.  Verdict for the plaintiff.  The defendant excepted.  *Reversed and remanded.*

*Theodore Hopkins* and *Richard Harthorne* (of New York City) for defendant.

*Charles H. Darling* and *Edmund C. Mower* for plaintiff.

SLACK, J.  On February 5, 1908, defendant issued to one Charles B. Kimball an ordinary life insurance policy on his life payable to the plaintiff if he survived the insured.  The premiums were payable semi-annually on February 5th and August 5th.  The insured died January 13, 1916; and the main question is whether the policy was in force at that time.  The policy provides that the payment of a premium shall not keep the policy in force beyond the date when the next premium is payable.  The premium due August 5, 1912, was not paid.  The rights of the parties, therefore, depend upon what occurred subsequent to that date.  The policy provides that if default be made in the payment of any premium after the policy has been in force three full years, the owner may within three months thereafter, but not later, elect (*a*) to accept the cash surrender value of the policy, or (*b*) have insurance for the face amount of the policy plus any outstanding dividend additions and less any indebtedness to the company thereon continued in force from the date of default for such time as is therein provided, etc., or (*c*) have paid-up nonparticipating insurance payable at the same time and on the same condition as the policy.  It further provides that if the insured does not within three months from default surrender the policy to the company at the home office for its cash surrender value as provided in option (*a*), or for paid-up insurance as provided in option (*c*), the insurance to which he is entitled will be continued as provided in option (*b*), for such term as the cash surrender value of the policy will purchase at a net single premium at the attained age of the insured according to the American Tables of Mortality, with interest at the rate of three per centum per annum.  The cash surrender value of a policy is made up of the reserve on such policy and on any dividend additions thereto, at the date of default, computed according to the American Tables of Mortality, with interest at the rate of three per centum per annum, less the amount of any

indebtedness to the company and less a surrender charge, depending in amount upon the length of time the policy had been in force at time of default.

About the time the August 5, 1912, premium was defaulted, steps were taken by the insured and the defendant to reinstate his policy and to that end he executed and delivered to the defendant a promissory note, referred to as the "blue note," for $19.00, and at the same time delivered to the defendant $9.62 in cash. The purpose of this transaction is stated in the note as follows: "This note together with Nine and $62/100$ Dollars in Cash deposited with said Company not as payment of premium either in whole or in part, but upon the following special agreement: First,—That the above numbered policy has lapsed for the non-payment of premium due on 8/5/12 and application is being made for its reinstatement; That evidence of insurability satisfactory to the Company and payment of all defaulted premiums with interest are conditions precedent to reinstatement which cannot be waived; That if, however, the Company find the evidence of insurability satisfactory, then, although the policy shall not be reinstated until the full payment required for reinstatement is made (1) the insurance called for by the policy shall be in force from the date of such findings until midnight of the due date of the note; and (2) if this note is paid on or before the date it becomes due, such payment, together with said cash, will then be accepted by said Company as payment of said premium with interest, and thereupon and thereby said policy and all benefits thereunder shall be reinstated; but (3) if this note is not paid on or before the date it becomes due, it shall thereupon automatically cease to be a claim against the maker and said Company shall retain said cash as part compensation for the rights and privileges hereby granted, and thereafter all rights under said policy shall be the same as if said cash had not been paid nor said application for reinstatement made." This note fell due November 5, 1912, and was not paid. The insured also owed defendant $64.00 which defendant loaned him on his policy in November, 1910, and some interest thereon. This being the status of the policy, and the insured having failed to elect to accept its cash surrender value or to take paid-up insurance, the defendant on or about August 4, 1913, foreclosed the policy which it then held as security for the $64.00 loan and ascertained, or attempted to ascertain, the amount of extended insurance to

which insured was entitled, and the time it would continue in force, and indorsed on the margin of the policy the following: "On account of default in the payment of the August 5, 1912, premium and loan interest this policy is continued for the reduced amount of $1,479 for the term of three years 274 days from August 5th, 1912 to May 6th, 1916"—and returned the policy to the insured. He retained it until the time of his death.

On the trial below plaintiff offered proof of the policy, of the indorsement thereon, and of the death of the insured and rested. None of these facts were controverted by defendant, but it claimed, and its evidence tended to show, that the term of extended insurance shown by the indorsement was erroneous, due to a mistake in the computation.

[1] At the close of the evidence defendant moved for a verdict on the grounds: (*a*) That the undisputed evidence showed that the policy expired before the death of insured; (*b*) that there was no evidence that defendant had waived payment of premiums or the blue note; and (*c*) that there was no evidence that the insured or the plaintiff had relied on the incorrect indorsement of extended insurance to their damage. The motion was overruled and defendant had an exception. In disposing of this motion the evidence must be considered in the light most favorable to plaintiff. *Fitzsimmons* v. *Richardson et al.*, 86 Vt. 229, 84 Atl. 811. He claims that the evidence made a case for the jury on the questions of mistake, waiver by defendant of its technical rights under the policy, and estoppel. The defendant's evidence tended to show that the computation which was the basis for the indorsement on the policy was made by clerks in one of the divisions of its actuarial department from data furnished by another division of the same department; that this data erroneously included the regular dividend for 1913 and an extra dividend for the same year, the two amounting to $15.95, and that the insured was given the benefit of this amount in the computation; that had these dividends not been included in the computation, the term of extended insurance would have expired July 13, 1915; that insured was not entitled to the benefit of these dividends because his policy lapsed August 5, 1912; that the mistake in the data furnished for the computation was made by the person who prepared the same in copying the record and setting each year's dividend back one year, in other words, the 1910 dividend was marked as a 1909 dividend, the 1911 dividend

as a 1910 dividend, etc., with the result that the 1913 regular dividend and extra were marked as 1912 dividends; that insured's policy was not entitled to participate in dividends until 1910 and was not entitled to an extra dividend until it had been in force five full years.

[2, 3] This evidence shows conclusively that it is only by including the 1913 dividends in computing the continued insurance that the term can be extended to the time of insured's death; unless in this computation the net premium at insured's actual age at time of default instead of the premium at his rated-up age is used. This question is considered later. It appears with equal force that the insured was not entitled as a matter of right, at the time of default, to the benefit of these dividends. But whether they were included in the computation by mistake or because defendant waived its technical rights is not so clear. After the insured defaulted the August 5, 1912, premium, steps were taken, as we have seen, to reinstate his policy. The blue note and cash, together equal in amount to the semi-annual premium, were delivered to the company under an agreement that if the insured furnished satisfactory evidence of insurability and paid the note when due, his policy and all benefits thereunder should be reinstated. Satisfactory evidence of insurability was furnished but the note was not paid, and, by the terms thereof, the rights of the insured under the policy then stood the same as though the cash had not been paid nor the application for reinstatement made. This provision as to payment was, however, for the benefit of the defendant and could be waived by it, so far as the insured was concerned, notwithstand- the provisions of G. L. 5575. If waived, and the policy treated as in force to February 5, 1913, the policy should be credited with the 1913 dividends and the extended insurance should be computed accordingly. We think there was some evidence of waiver, at least evidence from which such waiver might fairly be inferred. Mr. Moore, superintendent of the division of policy briefs, was called as a witness by defendant and testified that defendant keeps a history card of each policy issued by it which shows the history of such policy from the date of the application until the policy is finally disposed of, and that the entries appearing on the history card of this policy, subsequent to the date of the policy, were made under his supervision. It appears from these entries that the extended insurance on this policy was for

$1,479, continued in force three years and 100 days from February 5, 1913.  This would continue the insurance to May 16, 1916, ten days beyond the time of expiration stated in the indorsement and for the same amount there specified.  Defendant says Moore's testimony shows this entry was "only a memoranda of the first extension," but it is the only memoranda, or entry, of any extension appearing on the card where the history of this policy was kept.  Mr. Frobisher, superintendent of the renewing division, a witness called by defendant, testified on cross-examination that this policy lapsed for non-payment of the August 5, 1912, premium; that September 7, 1912, the insured made application for reinstatement and that the policy was reinstated, but did not know how long it continued in force.  So, too, waiver might fairly be inferred from the indorsement unexplained, and whether the proffered explanation was satisfactory was a question of fact.  We are not unmindful of the fact that there are circumstances tending to discredit the entry on the history card, but, on the other hand, that entry tends to discredit defendant's claim of mistake.

[4, 5]   We agree with defendant that a waiver is the voluntary relinquishment of some known right, benefit, or advantage, which, except for such waiver the party would otherwise enjoy, and that unless one is shown to have full knowledge of all the material facts that establish his right, he cannot be held to have waived it.  The defendant is presumed to have known the contents of the blue note, as well as its rights under it, and it appears from its own evidence that it knew it was not paid.  Knowing these facts, did it waive its right under that note and treat the policy as in force to February 5, 1913?  This was a question for the jury.

Because the insured was a sub-standard risk the policy issued is on the rated-up age plan.  It provides: "The Premiums, Loans and Surrender Values of this Policy are on the basis of the rated-up age of 43 years, which is 17 years in excess of the age stated by the insured.  If the age of the insured has been misstated, the amount payable hereunder shall be such as the premium paid would have purchased at the correct age rated-up 17 years."  As already seen, the term of extended insurance is such as the cash surrender value of the policy will purchase at a net single premium at the attained age of the insured, etc.

Plaintiff claims that the term attained age means actual age and not rated-up age, and that the extended insurance was continued for such term as a net single premium at insured's actual age at time of default would purchase instead of the term a like premium at his rated-up age would purchase. If this is so, the policy was unquestionably in force at the time of insured's death.

[6-8] We cannot, however, accede to this view. The language of the policy being that of defendant, all the conditions and provisions favorable to defendant are to be strictly construed against it, but the entire contract is to be construed together for the purpose of giving force and effect to each clause. *Duran* v. *Insurance Company,* 63 Vt. 437, 22 Atl. 530, 13 L. R. A. 635, 25 A. S. R. 773. And when so construed plaintiff's position is untenable. In the first place one of the things enumerated in the rated-up age provision as being affected thereby is *premiums.* "The Premiums, Loans and Surrender Values * * * are on the basis of the rated-up age," etc. Neither by express terms of the policy nor by implication, are the premiums there mentioned limited to those paid before the policy lapsed. The term includes, and applies, to all premiums. Furthermore, the right to continued insurance is one of the "surrender values" of the policy enumerated in the rated-up age clause. When the policy lapsed the insured had certain vested rights thereunder. He had the right to have the net cash the policy had earned, or a certain amount of paid-up insurance payable at his death, or the policy for its face, plus certain earnings and less any indebtedness to the company, continued for such time as the cash he was entitled to would purchase at a net single premium. Each of these is equally a thing of value to be given in exchange for the surrendered or defaulted policy. Moreover, that extended insurance is considered a surrender value under the terms of the policy is shown by the table of loan and surrender values made part of the policy, and which, so far as material, is as follows:

## TABLE OF LOAN AND SURRENDER VALUES

The figures in the following table are computed in accordance with the above provisions and upon the assumptions that premiums have been paid in full for the number of years stated below, that there is no indebtedness on the policy, and that there are no outstanding dividend additions.

| After Policy has been in force | Column 1 Cash surrender value. Loan value | Column 2 Paid-up Life Insurance | Column 3 $ (amt.) Insurance continued for | | |
|---|---|---|---|---|---|
| | | | Years | Months | Days |
| 3 | $ 68 | $131 | 4 | 0 | 0 |
| 4 | $ 93 | $177 | 5 | 3 | 0 |
| 5 | $126 | $236 | 6 | 9 | 0 |

See *New York Life Ins. Co.* v. *Van Meter's Admr.*, 137 Ky. 4, 121 S. W. 438, 136 A. S. R. 282; *Drury's Admr.* v. *New York Life Ins. Co.*, 115 Ky. 681, 74 S. W. 663, 61 L. R. A. 714, 103 A. S. R. 351, and *Federal Life Ins. Co.* v. *Kemp et al.*, 257 Fed. 265, 168 C. C. A. 349, where extended insurance is held to be a surrender value.

Extended insurance being a surrender value, it is manifestly covered by the rated-up age provision and therefore must be computed on the basis of the rated-up age attained by the insured at the time of default.

It would seem that any other construction would do violence to the plain meaning of the policy, when all its provisions touching this subject are considered together.

[9] This construction is in accord with the practical construction given these provisions by the parties. In the Table of Loan and Surrender Values aforementioned the term of continued insurance for each of twenty-two years is computed on the basis of the net single premium at the rated-up age of the insured at the time of default, and the same basis was used in computing the term specified in the indorsement on the policy, and neither the plaintiff nor the insured ever made the claim now urged until the question was raised in this Court. Thus, for more than twelve years they treated the language of the policy as meaning what we think it means, namely, that the

term *attained age,* in view of the presence of the rated-up provision, means the rated-up age attained, and not the actual age attained.

[10-11] The plaintiff also invokes the doctrine of estoppel. We held in 94 Vt. 100, 108 Atl. 921, that the indorsement on the policy was in effect only an admission, and it must be so treated in considering this question. If for no other reason, plaintiff cannot prevail on estoppel because, except for parts of a letter written by him to defendant August 10, 1916, which were improperly admitted in evidence, subject to defendant's exception, because purely self-serving declarations uncalled for by anything defendant had written or done, the case is barren of evidence to show that either plaintiff or the insured was induced by said indorsement to act or refrain from action—an essential element of estoppel *in pais. Vermont Acci. Ins. Co.* v. *Fletcher,* 87 Vt. 394, 89 Atl. 480; *Royce* v. *Carpenter,* 80 Vt. 37, 66 Atl. 888; *Pond* v. *Pond's Estate,* 79 Vt. 352, 65 Atl. 97, 8 L. R. A. (N. S.) 212; Bigelow on Estop., 437. Undoubtedly such fact may be proved by circumstantial evidence, or may be inferred where the circumstances are such that an inference may fairly be drawn, but it would be going far afield to indulge such an inference from what appears in this case. It was error to submit this question to the jury.

[12] Mr. Brown, head of the dividends division of defendant's actuarial department, was called by defendant, and after testifying in chief that the policy in question was not entitled to an extra dividend in 1912 and, according to the record, was not entitled to the 1913 dividends because the premiums had not been paid to February 5, 1913, was asked on cross-examination what would be the situation of a 1908 policy that lapsed before January, 1913, if reinstated, in respect to the five year dividend declared in 1913, and subject to defendant's exception that even if this policy was reinstated in August, 1912, by the terms of reinstatement and the blue note, it lapsed in November, 1912, and was a non-participating policy, was permitted to testify, in substance, that if the policy had been properly reinstated it would be entitled to the 1913 extra dividend. In view of the claim of waiver and the evidence of Frobisher that the policy was reinstated and the tendency of the entry on the history card to show that defendant treated the policy as in force to February 5, 1913, this cross-examination was proper.

The next exception is to a similar answer, which answer for the reason above stated was proper.

[13]    Mr. Wilson, superintendent of the general division of the actuarial department, was called by defendant and testified at length concerning the history of this policy and the method of computing extended insurance and testified that the claimed mistake was the result of a computation based on erroneous data. On cross-examination he was permitted to testify that the term of extended insurance, excluding the loan in the computation, would be six years and eighty-eight days from August 5, 1912. This was objected to on the ground that it was immaterial, irrelevant and incompetent, not because it was improper cross-examination. If proper cross-examination, a question not raised, it was competent even though it might have been incompetent if offered in chief. The witness having testified as an expert on the subject of extended insurance, this was a proper method of testing his knowledge of that subject, a right the cross-examiner was entitled to.

[14]    The cross-examination of the witness Looser, now complained of, if incompetent, was harmless. Its only tendency was to show that the $9.62 deposited with defendant at the time the blue note was given kept the policy in force to November 5, 1912. It is not claimed that this would entitle the insured to the benefit of the 1913 dividends, and the undisputed evidence showed that unless those dividends were used in computing the extended insurance the term would expire before the time of insured's death, even though continued in force from November 5, 1912, instead of August 5, 1912.

[15]    Defendant offered to show by Mr. Kane, a clerk in the actuarial department, that he had never known of any other error similar to the one here claimed being made by the defendant. The evidence was excluded and defendant had an exception. It is now claimed that the evidence was admissible as showing the effectiveness of the precaution used by the company to avoid error, and therefore is rebuttal of any evidence of estoppel. We cannot indorse this line of reasoning. It is not apparent how a person who by erroneous representations has induced another to act to his injury can escape liability by showing that he never made similar erroneous representations to any one else. The evidence was clearly incompetent.

[16]   Other exceptions saved are not briefed, and, therefore,. are not considered.

*Judgment reversed and cause remanded.*

POWERS, J., dissenting.   I cannot agree that the defendant had a right to use the rated-up age in computing the term of the extended insurance.

That the plaintiff did not question the method or accuracy of this computation, either below or on the original argument in this Court, is, under our holdings, of no importance.   The judgment below was for the plaintiff, and if there is any legal ground on which that judgment can be affirmed, it will be, whether that ground is urged by counsel or not.   *Simpson* v. *Central Vermont Ry. Co.*, 95 Vt. 388, 115 Atl. 299, and cases cited.

Before I take up the terms of this policy, I wish to make brief reference to the rules of construction applicable to such contracts.

All agree that they are to be construed against the company. Just how far this rule carries in a given case will be indicated by a reference to the decisions.   Chief Justice Rugg, in *Koshland* v. *Columbia Ins. Co.*, 237 Mass. 467, 130 N. E. 41, says that, ''when for any reason there is ambiguity in the terms employed in the policy, every doubt is to be resolved against the insurer and in favor of the insured.'' In *Goodwin* v. *Providence Savings Life Assurance Association*, 97 Ia. 226, 66 N. W. 157, 32 L. R. A. 473, 59 A. S. R. 411, it was said that, ''when the words used may, without violence, be given two interpretations, that which will sustain the claim and cover the loss should be adopted.''   This statement is quoted with manifest approval in *Kendrick* v. *Life Insurance Co.*, 124 N. C. 315, 32 S. E. 728, 70 A. S. R. 592, and other cases.

Our own cases are in accord with these holdings, and furnish an adequate guide to a correct determination of the questions before us.   In *Wilson* v. *Commercial Assurance Co.*, 90 Vt. 105, 96 Atl. 540, this Court called attention to the growing tendency toward treating insurance contracts as being in a class by themselves, and we referred to some of the considerations which had contributed to this result,—using rather mild language, I submit, compared with that previously used in some of our cases and those in other jurisdictions.   I do not refer to this case because

I deem it necessary to apply here any special rules of construction. On the contrary, I insist that the application of the ordinary rules of construction leads to the result I have reached, and I appeal to special rules only in case I fail otherwise to justify my conclusions.

In *Stanyan* v. *Security Mutual Life Ins. Co.*, 91 Vt. 83, 99 Atl. 417, L. R. A. 1917C, 350, in speaking of life insurance contracts, we said: "Language is to be interpreted in the sense intended by the parties, and the meaning and application of phrases and sentences is to be as understood by them, though the instrument be susceptible of a different interpretation. In ascertaining such meaning, consideration is to be given to the character and subject-matter of the statement and the end to be accomplished by it. Equivocation and uncertainty, whether in the significance of the terms used or the form and construction of sentences, are to be resolved in favor of the insured and against the company."

With this rule in mind, let us examine the policy before us. The clause directly in question reads as follows: "The term for which said insurance will be continued * * * will be such as said cash surrender value will purchase as a net single premium at the attained age of the insured." My first claim is that this language is too plain and unambiguous to require or admit of construction. It speaks in unmistakable terms. The words are "the attained age" of the insured. "Attain" means *to reach, to arrive at.* Webster's New Intern. Dict. 149. So the "attained age of the insured" is the age at which he has arrived; the age he has reached—his actual age. This seems too plain to be denied; and I assume that if this clause stood alone, unaffected by other provisions of the policy, its meaning would be admitted to be what I have stated. And I confidently assert that the language used is so specific and unequivocal that its meaning cannot be affected or controlled by anything elsewhere said in the contract. Suppose the clause had read "the actual age of the insured." Would any one claim that the meaning could be construed to be his "rated-up" age? I admit, of course, that the policy must be construed as a whole; that the meaning of one part may be affected by another; and that the instrument must be taken "by its four corners" when examined to determine its meaning. When this is done, what do we find?

On the first page of the policy, in the margin, in blanks prepared for that purpose, appear the words, "Age, 26"; and "Rated-up Age, 43." Apparently, then, two different ages are involved in the contract,—one being 17 years greater than the other. Again, in the body of the policy on that page, the following appears: "AGE. The Premiums, Loans and Surrender Values of this Policy are on the basis of the *rated-up* age of 43 years, which is 17 years in excess of the age stated by the Insured. If the age of the Insured has been misstated, the amount payable hereunder shall be such as the premium paid would have purchased at the correct age *rated-up* by 17 years." In both clauses of this paragraph the distinction between the real age and the rated-up age is carefully made. Except in the clause in question the matter of age is not elsewhere mentioned in the policy. So wherever else the policy refers to the matter—three times in all—"age" and "rated-up age" are shown and treated as different things; and when anything different than the true age is meant, the term "rated-up age" is used. But in the clause in question the term used is "attained age" of the insured. Now, if this company, whose contracts, as everybody knows, are drawn by its own high-salaried experts, had intended this clause to mean the "attained age of the insured rated-up by 17 years," why didn't it say so, just as it did in the last clause of the paragraph quoted above? To my mind the answer is very simple: The company used the term "attained age" for the very purpose of showing that it was the actual age and not the rated-up age that was to control the term, within the clause in question.

I agree that extended insurance is technically a surrender value, and but for the use of such a positive term as "attained age," the clause might have to be construed according to the views of the majority. But a computation of the extended insurance involves several factors, one of which is a determination of the cash surrender value. In finding this factor, the rated-up age is properly used and thereby it is cut down in amount and the advantage to the insured under his option is correspondingly decreased. I have no doubt the policy might have been so drawn as to justify the use of the rated-up age again in determining another factor of the computation, thereby further reducing the benefit of the insured's option, but from the language used it seems more reasonable that having used it once, the company designedly used the term "attained age" for the very purpose

of showing that it was not to be used again in that computation.

The majority calls attention to the fact that the rated-up age applies to premiums, and this is said to mean all premiums, both those paid before the forfeiture and those which came after, and so the cash surrender value is a premium included. Well, suppose this is so; I have already admitted that in ascertaining the amount of the cash surrender value the rated-up age was properly used. The argument cuts no figure beyond this, for the next step in the computation is one affecting not premiums, but age.

In *Hoffman* v. *Ætna, etc., Ins. Co.*, 32 N. Y. 413, 88 A. D. 337, the court of appeals said that "it is a rule of law, as well as of ethics, that where the language of a promissor may be understood in more senses than one, it is to be interpreted in the sense in which he had reason to suppose it was understood by the promissee." We said much the same thing in the Stanyan case, above cited; and it is settled by repeated decisions of this Court that a contract means just what the promisee had a right to understand it to mean and did understand it to mean. *Pocket* v. *Almon*, 90 Vt. 10, and cases cited. The language here, then, is to be construed in that sense in which the insured would reasonably apprehend the company would understand it. If it reasonably indicated to the insured that the actual age was to be taken in fixing the term, the company cannot now say otherwise. I submit that the insured would reasonably understand that this clause meant exactly what it said.

Remember all the time, that in order to justify my position, I am not required to prove it. I stand upon the plain words of the clause in question. Before these can be modified or controlled, it must be shown that they mean something else. The burden of proof, so to speak, is on the majority, to prove their construction, not by a preponderance of evidence, but beyond a reasonable doubt. For if there is a reasonable doubt about what the clause means, as Mr. Chief Justice Rugg says above, that doubt must be resolved in favor of the insured. If the meaning of the terms used is left uncertain, as we said in the Stanyan case, that uncertainty must be resolved in favor of the insured.

But the majority says that the parties have, by their practical construction, determined the meaning of this clause to be what the company is now contending for; and that this is so, because the tabulation on the second page of the policy makes

the extended insurance a surrender value, and the various terms of extended insurance therein specified are computed on the basis of the rated-up age; and these were adopted and assented to by the insured, because he accepted and retained the policy and never questioned them.

My answer to this argument is this: The insured did not by his silence indorse the figures or the method by which they were arrived at,—for the simple reason that he did not and could not know anything about the accuracy of either. So far as conveying any information to him, by which he could check up the process of computation or verify its results, is concerned, this table might just as well have been printed in Chinese characters. He was entirely at the mercy of the company. The process by which the results were reached was highly intricate and technical. A solution of the mathematical problem involved required various tables, a multitude of which are exhibits in the case, and mean nothing to one unskilled in their use; tables that would not be accessible to the insured, unless he applied to some insurance company for them. It also involved an examination of the records of the company, with computations based thereon, to determine the amount of dividends belong to the policy; all of which would be meaningless to any one who was not an expert in such matters. Then when he had gathered all the data before him, the chances of making the computation and getting a correct result were enormously against him, unless he was highly trained in the business. That I have not exaggerated his difficulties is apparent when I point to the fact that the company, itself, with its corps of experts, with all the data before them, have made and presented no less than three different computations of this extended insurance. I protest that one should not be held bound when he could not by any possibility know what he was consenting to. Moreover, the rule invoked by the majority applies only when the meaning of the contract is in doubt (*White* v. *Amsden,* 67 Vt. 1, 30 Atl. 972), and it is not every act of a party indicative of an understanding of the contract in accord with the claim of the other party that will be given the effect of a practical construction. *McLean* v. *Windham Light & Power Co.,* 85 Vt. 167, 81 Atl. 613. It must evidence a reasonable construction (*Gillett* v. *Teel,* 272 Ill. 106, 111 N. E. 722); it must be an act performed with knowledge (*Kane* v. *Schuylkill Fire Ins. Co.,* 199 Pa. 205, 48 Atl. 989); and must relate to the very provision of the con-

tract in question.  *Ib.*  What has this insured ever done to
indicate his understanding of the clause in question?  Nothing.
He paid his premiums for a time, and complied with various re-
quirements of the policy.  Thus far he treated the contract as
valid and binding.  But not a single act of his has the slightest
relation to the clause in question and therefore has not the slight-
est evidential value as to his understanding of its meaning.

I would affirm the judgment on the ground that the policy
was in force when the insured deceased.

MILES, J., concurs in this dissent.