**FARM BUREAU MUT. AUTOMOBILE INS. CO. v. VIOLANO.**

**VIOLANO et al. v. FARM BUREAU MUT. AUTOMOBILE INS. CO.**

**No. 54.**

Circuit Court of Appeals, Second Circuit.

Dec. 1, 1941.

William H. Edmunds and Guy M. Page, both of Burlington, Vt., for defendant-appellant and appellee Farm Bureau Mut. Automobile Ins. Co.

Peter Giuliani, of Montpelier, Vt., and Finn & Monti, of Barre, Vt., for plaintiff-appellant and appellee Rose Violano, adm'x.

C. O. Granai, of Barre, Vt., for defendants-appellants and appellees J. Alan Partridge and J. Arthur Partridge.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This is an appeal from a judgment holding Farm Bureau liable to the extent of $10,155 because of a judgment in the amount of $12,155 obtained by Rose Violano, as administratrix, against J. Alan Partridge for negligently causing the death of Geuseppe Violano while driving a Ford coach owned by his father, J. Arthur Partridge. Farm Bureau is admittedly liable to J. Alan in this amount under the "omnibus clause" of a policy issued to J. Arthur on the death car, unless J. Alan, at the time of the accident, was covered by other valid and collectible insurance. Such other insurance, according to Farm Bureau, was provided by a policy issued by the Shelby Mutual Plate Glass and Casualty Company. The court below held that the Shelby insurance did not apply to the accident in question, and Farm Bureau here challenges the validity of that holding. The judgment also held Farm Bureau liable to J. Alan for the expense of his defense in the suit brought against him by Mrs. Violano for $200 damages, for his confinement in jail under a body execution issued after Farm Bureau's refusal to pay the Violano judgment, and for the costs of the present action. There is a cross-appeal by Mrs. Violano, J. Alan and J. Arthur based on the court's failure to hold Farm Bureau liable for the full amount of the $12,155 judgment.

J. Arthur was the owner of four motor vehicles. Three of them, including the Ford coach which killed Violano, were insured by Farm Bureau. The policy on the coach was issued by it on February 22, 1934, and contained an omnibus clause providing that "the terms and conditions of this policy are so extended as to be available, in the same manner and under the same conditions as they are available to the Named Assured, to any person or persons while riding in or legally operating the within described automobile, and to any person, firm or corporation legally responsible for the operation thereof, provided such use or operation is with the permission of the Named Assured * * *. If any person, firm or corporation other than the Named Assured included in this insurance is covered by valid and collectible insurance against a claim also covered by this policy, such other person, firm or corporation shall not be entitled to indemnity or protection under this policy." The fourth vehicle, a Ford truck, was insured by a policy subsequently issued to J. Arthur by Shelby, dated April 30, 1934. That policy also contained an omnibus clause. The situation on June 26, 1934, then, was that J. Arthur was covered for any liability as owner or operator of his Ford coach and Ford truck, and that J. Alan, his son, was protected when using either vehicle with his father's permission. On that day, J. Alan, while driving the truck on the wrong side of the road, struck another vehicle and caused damages amounting to $175. He and his father were thereupon required by the Commissioner of Motor Vehicles, pursuant to the provisions of the Vermont Financial Responsibility Law, Public Laws of Vermont 1933, §§ 5190–5199, to file "proof of financial responsibility to satisfy any claim for damages" in specified amounts.

The law is by no means unambiguous as to the necessary extent of such proof. § 5190 says financial responsibility must extend to "any claim for damages," but in § 5191, on "coverage", it was thought necessary specifically to require proof as to "all motor vehicles owned by a person." This would not, at first blush, seem to require any proof from J. Alan, who owned no vehicles, but we may assume, as the commissioner and parties seem to have assumed, that J. Alan was obligated to prove his responsibility as an operator of any cars he might drive. Since he was already covered as to his father's vehicles, all he needed to satisfy the law was coverage as to the cars of third persons. Such coverage was provided by a rider, "Auto 1-S," endorsed in typewriting upon the Shelby policy on July 16, 1934. That rider provided: "In consideration of an additional premium of $3.80 Public Liability and $1.80 Property Damage, and the premium stated in the policy, it is agreed that the policy, subject to its limitations, covers the liability of J. Alan Partridge provided he is (1) a relative of the named assured who owns the automobile described in the policy, and (2) resides in the household of such named assured, and of any other person, firm or corporation covered by the policy for damages resulting from an accident occurring while such named relative is driving, or riding in any other automobile or motorcycle of any type with the permission of any person having the right to grant such permission, except an automobile or motorcycle (1) owned in whole or in part by such relative or any member of his household, or (2) registered in the name of such relative or any member of his household. The coverage provided under this endorsement shall not extend to the owners of the automobiles or motorcycles in which the named relative is riding or which he is driving at the time of the accident. The provisions of the policy in reference to other valid and collectible insurance are hereby eliminated as respects the coverage provided by this endorsement and it is agreed that if there exists, at the time of the accident any insurance taken out by or effected on behalf of anyone other than the named assured and under the terms of which the named assured is entitled to protection and coverage, then the coverage provided by this endorsement shall be excess insurance over and above the amount of such other valid and collectible insurance."

A second rider, "Auto 5-S," signed the next day, provided as follows: "*Uniform Financial Responsibility Endorsement:* Any coverage provided by this policy for liability for bodily injury or death or liability for property damage is hereby amended to conform with the provisions of the Motor Vehicle Financial Responsibility Law of the State or Province in which the disclosed automobile is registered at the time of the accident and/or in which the disclosed automobile is operated at the time of the accident during the policy period, to the extent of coverage and limits of liability required by such law but not in excess of the limits of liability stated in the policy. The assured

or any other person covered by the policy agrees to reimburse the Company for any payment made by the company on account of any accident claim or suit involving a breach of the terms or conditions of this policy, which payment the Company would not have been obligated to make under the provisions of this policy except for the agreement contained in the foregoing paragraph. Subject in all other respects to all the schedule of statements, general conditions, special conditions and representations of this policy."

A "Financial Responsibility Insurance Certificate," dated July 24, 1934, was thereupon signed by Shelby's authorized representative and filed with the state, certifying that J. Alan was covered while driving any automobile other than his own. On August 4th, J. Arthur filed Farm Bureau's certificate covering his liability as owner of the Ford coach.

 After this prologue, J. Alan, while driving the Ford coach, struck and killed Geuseppe Violano. His administratrix sued J. Alan and recovered a judgment of $12,000 damages and $155 costs. The case at bar was brought to compel Farm Bureau to pay this judgment, for at least $10,155[1] for which, as we have said, it is clearly liable unless J. Alan was covered at the time of the accident by other valid and collectible insurance. Farm Bureau asserts that such other insurance was in existence by virtue of the riders to the Shelby policy and the certificate filed by it. Interpreting Auto 1-S in accord with its terms, it would seem apparent that J. Alan was not protected while driving the Ford coach covered by Farm Bureau, because that coach was an automobile "owned in whole or in part by such relative or any member of his household." Farm Bureau argues that "his household" must be taken to mean "a household of which he is the head." We cannot accept that construction. In normal speech, one's household is the familial or residential group with which one lives; a wife or child, as well as the pater familias, has a household. The purpose of excepting cars owned by members of J. Alan's household was to reduce insurer's risk; words having a similar purpose were given their ordinary meaning in Cartier v. Cartier, 84 N.H. 526, 153 A. 6 and in Home Insurance Co. v. Pettit, 225 Ala. 487, 143 So. 839. This interpretation is clinched by the fact that the coverage of Auto 1-S was available to J. Alan only if he resided in his father's household. The exclusion clause could not, therefore, have been intended to apply to vehicles owned by members of some nonexistent household of which J. Alan was the head, since, unless J. Alan was a member of his father's household and was simultaneously head of another, the only vehicles to which it could conceivably apply would be those owned by other members of his father's household. Shelby's Auto 1-S, therefore, did not insure the Ford coach, and Farm Bureau cannot avoid the liability assumed by its omnibus clause.

 Nor was coverage extended by Shelby to the Ford coach by virtue of the second rider, Auto 5-S. That rider only amended the "coverage provided by this policy" to conform to the requirements of the Vermont Financial Responsibility Law. We interpret that to mean that so far as the coverage already granted was qualified or restricted by provisions in conflict with that law—for example, as to freedom of cancellation[2] or as to the effect of false representations or warranties[3]—those qualifying provisions were waived as to third parties. But granting, arguendo, that the policy was amended to include, if the Financial Responsibility Law so required, the Ford coach,[4] the indisputable fact is that the Financial Responsibility Law did not so require, since protection was already available to J. Alan by the omnibus clause of the Farm Bureau policy. Pushing Auto 5-S to the very limit—to include every type of cov-

[1] The limit of its policy, $10,000, plus the costs.

[2] The policy was in terms cancellable on 10 days' notice by either J. Arthur or Shelby. By § 5193, the policy must be non-cancellable except on 10 days' notice to the commissioner.

[3] Misrepresentation and fraud, according to the agreement, were to void the policy. But § 5194 required the policy to carry a certificate waiving as to injured persons all defenses based on false representations or breach of warranties in the application, if the insured had been convicted of an act included in § 5190(1).

[4] We need not decide whether the rider was intended to extend coverage to vehicles not already insured; possibly that would be more than an amendment of the "coverage provided by this policy." This view is confirmed by the reference in Auto 5-S to the "disclosed automobile," which even taken in the plural seems to demonstrate that there was no intent to increase the class of vehicles included.

erage which was *required* by the Financial Responsibility Law—we cannot stretch it to cover anything more than risks not already covered by some insurer.[5] There is, of course, no statutory requirement that all risks be covered by the same insurer.

■■■ Can Farm Bureau, as a last resort, set up the certificate filed by Shelby covering J. Alan's liability as operator of any vehicles but his own? Since the meaning of the second rider is not in doubt, the certificate cannot be used to explain its terms, on a. theory · that the parties put in the certificate what they thought was included in the second rider. Viewed independently, the certificate was not insurance but only an administrative document for the convenience of the commissioner. It was "proof of financial responsibility," and the statute, §§ 5193, 5194, expressly authorizes proof other than insurance. Since the purpose of the statute is the protection of the public, it is quite clear that the commissioner could properly accept a simple surety agreement or even a deposit by the operator himself. Nothing in the statute even suggests that the operator must procure indemnity against ultimate personal responsibility, as well as protection for the public.[6] If the commissioner regarded the certificate as an inadequate proof of the existence and terms of outstanding insurance, he could have required the filing of further proof; §§ 5193, 5195.

■■■ Let us assume, however, that a judgment creditor of the assured may hold an insurer for liability which it certifies to the Commissioner that it has assumed, though beyond the terms of its policy.[7] Such a result could be defended on a theory that the insurer, by an erroneous statement, had induced the Commissioner to forego further proof of financial responsibility, and was, therefore, estopped from repudiating, as to the victim, a liability which would otherwise have been covered by insurance. It would be a travesty to extend a similar advantage to Farm Bureau, which was paid for covering the risk in question, since (unlike the victim) it is not within the group intended to be benefited by the law, and (unlike the Commissioner) it cannot be said to have relied upon the certificate. Certainly, by "insurance", as used in its "other valid and collectible insurance" clause, Farm Bureau meant something more than the liability of another insurer to a victim arising out of a misstatement in a certificate filed, after Farm Bureau issued its policy, only because of an accident which could not have been in contemplation· when that policy issued. The doctrine that ambiguities are to be resolved against the insurer Spaulding v. Mutual Life Insurance Co., 96 Vt. 67, 117 A. 376; Kimball v. New York Life Insurance Co., 96 Vt. 19, 116 A. 119, proves nothing. Even if there had been equivocation in the Shelby policy (and there was not), that doctrine could not be availed of by Farm Bureau since it was never intended as a shield for an insurer against its insured. Farm Bureau is, therefore, liable, as found by the District Court, to Rose Violano for $10,000 of her judgment, plus costs and interest amounting to $2,348.07, and for the costs of this action. For its wrongful repudiation of liability, it is liable to J. Alan for the expenses of his defense, $2,960.21, and for the damages attributed to his incarceration, $200, plus the costs of this action.

■■■ A cross-appeal is based on Farm Bureau's failure, after judgment, to accept an offer made by Rose Violano to settle for $8,000. By refusing to accept this offer, it is argued, Farm Bureau has caused to J. Alan a loss of the $2,000 difference between its liability under the policy and the amount of the judgment. But, so long as it acts in good faith, considering the interests of the insured as well as its own interest, and not capriciously, an insurer cannot be required to settle a case rather than to litigate a doubtful issue, nor to bear the financial burden imposed on the insured if ultimate liability should exceed the policy limit. This is the law in Vermont and elsewhere, Johnson v. Hardware Mutual Casualty Co., 109 Vt. 481, 1 A.2d 817, and cases there cited, as to offers to settle made before judgment.

---

[5] If· insurance against liability for the unauthorized use of vehicles was required by that law (and we have been referred to no cases or administrative interpretation so holding), we might deem the Shelby policy amended to include an unauthorized use of the Ford coach, since that risk was excluded by the Farm Bureau policy. But that coverage—and I do not regard even it as established— would not draw with it liability for authorized use, a risk already covered.

[6] And so the parties understood, since· liability over to the insurer in some circumstances was contemplated by Auto 5-S.

[7] The statute provides no penalty for a false or misleading certificate.

Certainly, if a different rule is to be applied to offers to settle after judgment, it would be more lenient to the insurer, which no longer has the exclusive control that results from its power, before final judgment, to prevent the insured from assuming liability or settling a claim. But the applicability of a less stringent rule need not be passed on, since there was no showing that the insurer did not meet the higher standard. The legal issue of Farm Bureau's liability was in real doubt. We cannot hold that the insurer's conduct exhibited a disregard of the welfare of the insured of the kind penalized in Johnson v. Hardware Mutual Casualty Co., supra.

The judgment is affirmed.