ANTONIA PELLON ET AL. *v.* CONNECTICUT GENERAL LIFE INSURANCE COMPANY (two cases).

May Term, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed October 3, 1933.

510

*J. Ward Carver* and *Charles H. Voorhees* (of Hartford, Connecticut) and *George B. Young* (of counsel) for the defendant.

*Theriault & Hunt* for the plaintiff.

GRAHAM, J.   These actions were brought by and on behalf of the beneficiaries to recover the amount of two life insurance policies on the life of Venerando Paz, who died in the city of Barre on February 13, 1931.   The policies are identical, except the amount of insurance and the beneficiaries therein named. Both policies were issued on a single application, and were for $10,000 and $5,000, respectively.   The cases have been heard together by agreement.   There was a trial by jury resulting in a verdict and judgment for the plaintiffs, and the cases are brought to this Court on defendant's exceptions.   The defense pleaded and relied upon was fraud on the part of the insured in procuring the policies.   The plaintiffs denied the charge of fraud, and they alleged and claimed a waiver by defendant of any forfeiture. . This review involves a consideration of those questions.

The written application for the insurance consists of two parts:   It was signed by the insured, copies were attached to the policies when issued, and, by the terms of the policies, it is expressly made a part of the contract.   The insured signed a statement, which was contained in part 2 of the application, that all his answers to questions therein were complete and true, and that they should form a part of the insurance applied for. The policies contained this provision:   ''The consideration for

this insurance is the application, a copy of which is attached hereto and made a part of this contract, and the payment in advance of the annual premium.'' It is also expressly provided in the policies that they should not take effect until the first premium was actually paid, and that the policies and the application therefor constituted the entire contract between the parties and all statements made in the application should, in the absence of fraud, be deemed representations and not warranties.

The application (part 2) was signed by the insured on October 7, 1929. The policies were dated October 14, 1929, and they were delivered to the insured two or three days thereafter. The first premium was paid by the insured on December 14, 1929, the last day the policies could be placed in force.

The charge of fraud alleged against insured and relied upon in defense is based upon the following questions and answers of part 2 of the application:

''7. Have you at any time had or been told you had (b) asthma, tuberculosis of any organ, spitting of blood, chronic bronchitis, chronic cough or expectoration, pleurisy, pneumonia, palpitation or any disease of the heart, lungs or throat?'' Answer: ''No.''

''8. (a) Have you had medical advice during the last five years? If so, for what ailments, duration and approximate dates? Give names and addresses of all physicians consulted.'' Answer: ''No.''

''8. (b) Name of family physician.'' Answer: ''None.''

''9. Are you now in good health? Answer: ''Yes.''

At the close of the evidence the defendant moved for a directed verdict on the ground, in substance, that the evidence, taken most favorably for plaintiffs, establishes that these answers were such misrepresentations of material facts as to avoid the policies, and that the forfeiture has not been waived by it. The motion was overruled, and defendant excepted. The plaintiffs argue that the evidence justifies a finding by the jury that the written application is not the true application of the insured; that the written questions were not asked the insured, nor were the signed answers given by him to the defendant's medical examiner, so the recorded answers have no legal significance or binding force as a part of the contract between the parties, or, in other words, that the defendant, by reason of the conduct and

knowledge of its medical examiner is estopped to assert the falsity of the written answers as a defense to the policies. The plaintiffs also contend that, if the charge of fraud as alleged is established, the evidence warrants the submission to the jury of the issue that the defendant is estopped to assert a forfeiture.

The scope of the contract presents the first question for discussion. The insured was a retired stone cutter, but when the application for insurance was made and at the time of his decease, he was engaged in the automobile business. He owned a large building in the city of Barre, in which was located his garage. He did business with the public generally. He was of Spanish descent, and he could not read the English language; he could speak English only brokenly, and had difficulty in understanding spoken English. The defendant's medical examiner did not ask him the questions as framed in the written application, but there was no intent or purpose on his part to deceive either the company or the insured. The only inference justified by the record is that the questions were framed and asked by the medical examiner in modified form to make the examination more understandable to the insured. The schedule of diseases in question 7 of the application was not read to the insured, but he was asked if he had had any cough, been sick, and he answered, "Nothing only little colds and cough"; that he had not ever been seriously sick, except he had the "flu" in 1918. Instead of question 8 (a) as appears in the application, the insured was asked if he had been sick to have a doctor within the last five years, and he answered, "No." Instead of question 8 (b), he was asked, "Who is your regular doctor?" and he answered, "None." Instead of question 9, he was asked if he felt well, or "Do you feel good?" and he answered, "Yes." The statement that the answers were complete and true was not read to the insured before he signed the application. The facts of the examination appeared from testimony introduced by the defendant, so no question is presented as to the admissibility of parol testimony to contradict the written answers to the questions in the application. Our inquiry is confined to a determination of whether the facts disclosed, known to the company through the knowledge of its medical examiner and agent, estops the defendant from asserting fraud based upon any of the alleged false answers in the written application. *Ring* v. *Wind-*

*sor County Mutual Fire Ins. Co.,* 51 Vt. 561, 568, 569; *Arnhorst* v. *National Union,* 179 Ill. 486, 53 N. E. 988; *Sternaman* v. *Metropolitan Life Ins. Co.,* 170 N. Y. 13, 62 N. E. 763, 57 L. R. A. 318, 88 A. S. R. 625.

■ The defendant contended below and argues here that, since the insured had the policies in his possession, with copies of the application attached, for a considerable length of time before his death, and for about sixty days before the payment of the first premium, the plaintiffs are estopped from denying that the policies and the written application constitute the contract between the parties, and that they can recover only in accordance with its terms. The plaintiffs say in their brief that such an estoppel is not available to the defendant because it was not pleaded, but as this question was not raised below it is not before us for review. *The Cutler Co.* v. *Barber,* 92 Vt. 468, 475, 108 Atl. 400. The transcript discloses that this issue was raised by the defendant early in the trial below.

In support of its contention that if the insured could not read the English language it was his duty to have someone in whom he had confidence read the contract to him, and that he was still bound by its terms after having accepted and retained it, the defendant cites, among other cases, several recent decisions of the New York Court of Appeals, including *Kwiatkowski* v. *Brotherhood of American Yeomen,* 243 N. Y. 394, 153 N. E. 847; *Satz* v. *Mass. Bonding & Ins. Co.,* 243 N. Y. 385, 153 N. E. 844, 59 A. L. R. 606; *Stanulevich* v. *St. Lawrence Life Assn.,* 228 N. Y. 586, 127 N. E. 315. See, also, *Minsker* v. *John Hancock Mutual Life Insurance Co.,* 254 N. Y. 333, 173 N. E. 4, 81 A. L. R. 829. But it should be noted that the rule of the New York court as applied in *Sternaman* v. *Metropolitan Life Ins. Co., supra,* has been superseded by a statutory rule which provides, in effect, that a copy of the application shall be attached to the policy when issued, and that the policy shall contain the entire contract between the parties. The recent New York cases cited by defendant are apparently governed by this statute. See *Minsker* v. *John Hancock Mut. Life Ins. Co., supra.*

■■ On the other hand, the facts do not support the contention of the plaintiffs that the written application as a part of the contract did not have any legal existence. It is the unquestioned rule of our cases that parol evidence is admissible to

show that a written contract never had any binding force because induced by fraud. *Vaillancourt* v. *Grand Trunk Ry. Co.,* 82 Vt. 416, 424-425, 74 Atl. 99; *Drown* v. *Oderkirk,* 89 Vt. 484, 488, 96 Atl. 11; *Holbrook Grocery Co.* v. *Armstrong,* 97 Vt. 197, 201, 122 Atl. 458. But here the evidence does not justify the inference that the insured was induced to sign the written application through any fraud of the medical examiner. He did nothing to induce the insured not to have the application read to him by someone on whom he could rely before it was signed; that this was not done was due rather to the negligence of the insured than to any deception of the medical examiner. At most the record supports the conclusion that the medical examiner was negligent in the performance of his duty, both to the insured and to the company.

The rule applicable to the precise question before us, and as established by the weight of authority, is stated in Cooley's Briefs on the Law of Insurance, Vol. 3, page 2594, as follows: ''Where the insured, in good faith, makes truthful answers to the questions contained in the application, but his answers, owing to the fraud, mistake, or negligence of the agent filling out the application, are incorrectly transcribed, the company is estopped to assert their falsity as a defense to the policy. The acts of the agent, whether he is a general agent with power to issue policies, a soliciting agent, or merely medical examiner for the company, are in this respect the acts of the company, * * * *.'' In *Germania Life Ins. Co.* v. *Lunkenheimer,* 127 Ind. 536, 26 N. E. 1082, 1084, it is said: ''If the applicant for insurance in good faith gives truthful answers to such questions as are asked him, but the agent, whether purposely or not, but without the knowledge or connivance of the assured, inserts false answers, the wrong is that of the company, and not that of the assured. The company will be estopped to attribute wrong to the assured.'' It is pointed out in *Union Mut. Life Ins. Co.* v. *Wilkinson,* 13 Wall. 222, 236, 20 L. ed. 617, that: ''This principle does not admit oral testimony to vary or contradict that which is in writing, but it goes upon the idea that the writing offered in evidence was not the instrument of the party whose name is signed to it; that it was procured under such circumstances by the other side as estops that side from using it or relying on its contents; not that it may be contradicted by oral testimony, but

that it may be shown by such testimony that it cannot be lawfully used against the party whose name is signed to it.'' See, also, *Simmons* v. *Washington Fidelity Nat. Ins. Co.*, 140 Or. 164, 13 Pac. (2d) 366. Under such circumstances the law does not say that the written contract is not the existing contract between the parties, but it does not permit the company to take advantage of such a contract because it would be against equity and opposed to public policy. *Sternaman* v. *Metropolitan Life Ins Co.*, *supra.* And the rule is to be applied liberally with reference to an illiterate applicant. *Suravitz* v. *Prudential Ins. Co.*, 244 Pa. 582, 91 Atl. 495, L. R. A. 1915A, 273; *Gioia* v. *Metropolitan Life Ins. Co.*, 97 Misc. 380, 161 N. Y. S. 234; *Campdon* v. *Continental Assur. Co.*, 305 Pa. 253, 157 Atl. 464. But as a prerequisite to the application of such an estoppel, the rule requires perfect good faith of the applicant, and will not tolerate intentional wrong on his part. *McComb* v. *Council Bluffs Ins. Co.*, 83 Iowa, 247, 48 N. W. 1038. It presupposes the existence of entire good faith on the part of the insured, and the absence of circumstances that would impute to him knowledge.that the insurer would be deceived by the application submitted. *Layton* v. *New York Life Ins. Co.*, 55 Cal. App. 202, 202 Pac. 958; *Michigan Mut. Life Ins. Co.* v. *Leon,* 138 Ind. 636, 37 N. E. 584; *Gratton* v. *Metropolitan Life Ins. Co.*, 92 N. Y. 274, 284, 44 A. R. 372; *Roe* v. *National Life Ins. Assn.*, 137 Iowa, 696, 115 N. W. 500, 17 L. R. A. (N. S.) 1144; note 81 A. L. R. 833, at page 865. It would be a fruitless undertaking to attempt to analyze and reconcile the many conflicting decisions cited by counsel on this subject, but in the main they may be reconciled by reference to the special facts in each case which distinguish it from others. We must give heed to the particular facts of record, taken in the light most favorable to the plaintiffs, to see if they bring the case within the rule of estoppel just stated.

■ On March 9, 1928, Dr. Wark made an examination of the insured's chest. The insured was complaining of shortness of breath and cough. The doctor found that the insured then had characteristics of silicosis, granite dust involvement of the lungs, which is found in old granite cutters. July 4, 1929, the insured had a cold, and accompanied by a nephew who acted as interpreter, he consulted Dr. Wark at his office. He complained of coughing, shortness of breath, and spitting of blood. He told

the doctor, through the interpreter, that two years before when he had a cold he thought he found traces of blood in his sputum. The doctor gave him medicine, advised quietude, and a specimen of his sputum was taken and sent to the state laboratory for analysis. The sputum test was positive, but the report was not shown to the insured nor was he told about it. Upon inquiry the doctor told the insured that there were "no bugs." The medicine prescribed for the insured was yellow elixir calcium chloride, to increase coagulability of the blood and to stop hemorrhage or the spitting of blood. The same medicine was prescribed by Dr. Wark on July 13, and July 31, 1929. About August 22, 1929, the insured again went with the same interpreter to see Dr. Wark and requested another sputum test. A second specimen was sent to the state laboratory and the report was positive. The presence of tubercular bacilli in the sputum is positive diagnosis of the existence of tuberculosis. The second report was mailed by Dr. Wark to the insured, but the plaintiffs' evidence tended to show that it was destroyed and the insured never saw it. Dr. Wark, however, testified that in December, 1929, he met the insured and asked him if he had received the report which was mailed and he replied that he had, and that he knew all the time that he had tuberculosis. September 7, 1929, the insured consulted Dr. Avery, superintendent and physician of the Washington County Hospital for the Treatment of Tuberculosis, and requested an examination of his lungs. After an examination was made, Dr. Avery told the insured that he had pulmonary tuberculosis. Someone accompanied the insured on this occasion, but who it was does not appear. Some of the doctor's questions were answered by the insured, and some of them were answered by the interpreter. Dr. Avery suggested a sputum test, but learned, either directly from the insured or through the interpreter, that he had had a sputum test and that it was positive. If, as the plaintiffs claim, there was evidence tending to contradict and to impeach the testimony of Dr. Wark, it cannot be said that there was any such evidence as to the testimony of Dr. Avery. His testimony was not contradicted, and his credibility was unimpeached. It establishes positive knowledge by the insured of the diseased condition of his lungs only one month before this application for insurance was signed. There was evidence tending to show that

in March, 1929, the insured was examined by Dr. McFarland and found to be what the doctor considered sound; that until a few days of his death he was engaged in general duties about his garage; and that his general appearance as to health was good. But when the insured told the medical examiner in reply to his questions that, except for the "flu" in 1918, he had had only little colds and cough; that he had not been sick to have a doctor; and that he felt well, felt good, he knew that because of coughing and spitting blood his lungs had been examined by two doctors; that two sputum tests had been made, and that the result of at least one of them was positive; that he had been taking medicine prescribed by Dr. Wark after his chest examination, and he had been told by Dr. Avery that he had pulmonary tuberculosis. These facts could not have indicated to the insured merely a temporary indisposition, and not of a character seriously to affect his general health. There is nothing in the evidence to show that the medical examiner knew any of these facts when he made his examination and reported the insured favorably to the company. Can it be said in the face of this record that the insured acted in good faith, and answered truthfully the questions asked him? We think not. The insured was an intelligent business man and must have known that the questions asked him were to elicit the facts concerning apparent ailments of a serious character and his consultations with physicians about those ailments, and that his answers to those questions were material to the risk to be assumed by the company. Good faith required him to disclose those facts, but instead, he gave answers well calculated, and which apparently did, deceive the examiner. *Spaulding et al.* v. *Mut. Life Ins. Co. of N. Y.*, 94 Vt. 42, 48, 109 Atl. 22; *Cummings* v. *Connecticut Gen. Life Ins. Co.*, 101 Vt. 73, 88, 142 Atl. 82; *Smith* v. *Ætna Life Ins. Co.*, 49 N. Y. 211; *Vose* v. *Eagle Life & Health Insurance Co.*, 60 Mass (6 Cush.) 42. Since the conduct of the insured was incompatible with good faith, the plaintiffs failed, as matter of law, to establish an estoppel against the defendant from asserting fraud based upon false answers in the written application, or, to assert the same thing in another way, the plaintiffs are estopped to deny that the policies and written application constitute the contract between the defendant and the insured. See *Haapa* v. *Metropolitan Life Ins.*

*Co.,* 150 Mich. 467, 114 N. W. 380, 16 L. R. A. (N. S.) 1165, 121 A. S. R. 627. This conclusion is fortified by the fact that if complete and true answers had been made to the questions asked of the insured the insurance could not have been procured. *New York Life Insurance Co.* v. *Fletcher,* 117 U. S. 519, 29 L. ed. 934, 6 Sup. Ct. 837; *Henson* v. *John Hancock Mutual Life Ins. Co.,* 261 Mich. 693, 247 N. W. 102.

■ ■ What we have said in connection with our holding that the plaintiffs are bound by the questions and answers appearing in the written application effectively disposes of the issue of fraud by the insured in obtaining the insurance. The insured, at the time he signed the application, had tuberculosis, and he knew it. His misrepresentations in the application were material to the risk, and they induced the contract. His intent to deceive the company is too clear to be doubted. *Spaulding* v. *Mutual Life Ins. Co. of N. Y., supra.* In the circumstances the law infers it. *Fitzgerald* v. *Metropolitan Life Ins. Co.,* 90 Vt. 291, 305, 98 Atl. 498. It follows that the policies were rendered voidable by the false representations of the insured, and the defendant's motion should have been granted, unless the defendant is estopped to rely upon them, by reason of its knowledge, express or implied, of their falsity.

There is a bureau through which information relative to rejected applicants is communicated to life insurance companies, which subscribe to the service. As the result of an arrangement with the defendant, the bureau, on October 28, 1929, transmitted to the defendant a card in code, called in the record an "M.I.B." card, which to one having the code, or being familiar with it, conveyed the information that the insured "had a rapid pulse and consumptive tendency." The card reached the records department in the home office of the defendant and was handled by one of twenty clerks in that department. It was the duty of this clerk to minute the receipt of the card on the file mark, or work sheet, pertaining to the insured, and then file the card in alphabetical order in the records department, where such cards were kept on file. Through error, the notation was not made on the file mark, but the card was filed and kept in its proper place. The information conveyed by the card did not come to the attention of any of the defendant's officers, whose duty it was to issue policies or pass upon risks, until a few days

before the trial. At the time the card was received at the home office of the company, the policies had been sent to the local agent for delivery to the insured; but by their terms, they were not in force because the first premium had not been paid. The policies on November 8, 1929, were in the defendant's possession at its home office for the purpose of change of beneficiaries. Premiums were paid by the insured, and accepted by the defendant to the date of insured's death. The defendant's underwriter, who approved this application, testified that if he had had the information conveyed by the card, he would have referred the case to the medical department; and the physician in charge of the medical department testified that if he had had the information he would not have approved the application.

These facts present two questions for discussion: (1) Was the defendant charged with knowledge of the card? (2) Was such knowledge of itself, or with information which it indicated would be produced by reasonable inquiry, and the subsequent conduct of the defendant, sufficient to make it a jury question whether the defendant is estopped from asserting a forfeiture?

The defendant argues that the knowledge of a mere clerk will not be imputed to the corporation and cites Thompson on Corporations, 3rd edition, § 1788. While this is a correct statement of a general rule, it has its exceptions. Knowledge of a clerk is imputable to the corporation under some circumstances. 37 C. J. 531; *Chicago, B. & Q. R. R. Co.* v. *Hammond,* 210 Ill. 187, 71 N. E. 576; *Twombly* v. *Framingham Gas, Fuel & Power Co.,* 248 Mass. 53, 142 N. E. 828. Corporations can do business only through officers or agents, and any notice or knowledge imparted to an officer or agent authorized to receive the same is actually imparted to the corporation. *Eckert* v. *Century Fire Ins. Co.,* 147 Iowa, 507, 124 N. W. 170. Notice to a clerk is notice to the corporation if he stands in such relation to it or to the fact communicated that it is his duty to communicate it to his superiors, 14A C. J. 485. "The test to be applied," says the court in *Lane* v. *United Elec. L. & W. Co.,* 88 Conn. 670, 92 Atl. 430, 431, "does not look to rank or title, but to the duties assigned, and the authority and obligations which went with that assignment." The force of the rule is not weakened by the fact that the information was not,

in fact, communicated to the superior officers. *Hand & Johnson Tug Lines* v. *Canada S. S. Lines* (C. C. A.), 281 Fed. 779, 783; *Union Gas & Oil Co.* v. *Wright*, 200 Ky. 791, 255 S. W. 697, 698; *Dillard* v. *Olalla Mining Co.*, 52 Ore. 126, 94 Pac. 966, 968; *Neal* v. *Cincinnati Union Stock Yards Co.*, 25 Oh. Cir. Ct. R. 299, 302. In the last-named case it is said: "While the corporation only is chargeable with that knowledge which comes to each of its servants within the scope of the duties of each of its servants respectively, the corporation as the common head, brain center so to speak, must be held to have the composite knowledge which comes to it through the channels of its several servants. It is not necessary that any one servant should know all the facts. If it were, all a corporation would have to do would be to limit the scope of the duties of each servant, and the corporation could never be held to know all about anything."

The defendant cannot escape the imputation of knowledge by showing that its clerk was negligent in not communicating the information, or in not noting it where the company's underwriters would most likely find it. Aside from the notice to the clerk of the card and what it contained being notice to the corporation, the card from the time of its receipt was kept by the defendant in its files, and where it belonged. This itself was notice to it, and it will be presumed to have knowledge of the contents of the card. *Kimball* v. *New York Life Ins. Co.*, 96 Vt. 19, 27, 116 Atl. 119; *O'Rourke* v. *John Hancock Mutual Life Ins. Co.*, 23 R. I. 457, 50 Atl. 834, 57 L. R. A. 496, 500, 91 A. S. R. 643. The card clearly indicates that the representations of the insured in the written application were not complete or true, and, in view of the nature of the contract, it was sufficient to put the defendant upon inquiry. As to this, the testimony of the defendant's witnesses, as we have seen, leaves no room for doubt. It was for the jury to say what would constitute reasonable inquiry, and what facts as to insured's health would have been disclosed to the defendant by reasonable diligence in prosecuting its inquiry. *Farmers Exchange* v. *Lowney Co.*, 95 Vt. 445, 450, 115 Atl. 507. The defendant was chargeable with all such facts as reasonable diligence in prosecuting its inquiry in the proper direction would have brought to its knowledge. *Farmers Exchange* v. *Lowney Co.*, *supra;*

*Passumpsic Savings Bank* v. *First Nat. Bank,* 53 Vt. 82, 89, 90; *Tomasi* v. *Kelley,* 100 Vt. 318, 323, 137 Atl. 196. Of course, since no inquiry was made, there can be no certainty what facts would have been produced, but from the apparent ease with which the evidence of the true facts was produced at the trial, and from other circumstances shown in evidence, the jury might well infer that a similiar result would have been produced if reasonable inquiry had been made at any time after the receipt of the card.

The defendant argues that, even so, the evidence failed to establish a waiver, that is, a voluntary relinquishment of a known right. But we have taken occasion in several cases to state our rule as applied to insurance contracts, and to draw the distinction between waiver and estoppel as applied to such contracts. *Cummings* v. *Connecticut Gen. Life Ins. Co.,* 102 Vt. 351, 360, 148 Atl. 484; *Webster* v. *State Mutual Fire Ins. Co.,* 81 Vt. 75, 80, 69 Atl. 319. It makes little difference, except for accuracy of expression, whether the term used is "waiver" or "estoppel." See *Spaulding, Admr.* v. *M. L. Ins. Co. of N. Y.,* 96 Vt. 67, 76, 77, 117 Atl. 376. The terms are used interchangeably in the cases, and whichever is used the meaning and result are the same. In the interest of clearness of expression, it has been suggested that "election" is the appropriate term to be used. 18 Harv. Law Review, 364; 29 Harv. Law Review, 724. Our rule is that when an insurer with full knowledge elects not to take advantage of a forfeiture, he waives it, and cannot assert it in defense, though the insured was not misled to his prejudice. Such a waiver may be express or implied, before or after the forfeiture. *Cummings* v. *Connecticut Gen. Life Ins. Co., supra.* An insurance company which thus waives a forfeiture is bound to treat the contract of insurance as though no forfeiture had occurred. *Francis* v. *London Guarantee & Accident Co.,* 100 Vt. 425, 430, 138 Atl. 780. See, also, *Bardwell* v. *Commercial Union Assur. Co.,* 105 Vt. 106, 163 Atl. 633, 636, and cases there cited.

It is a general rule that, where insurer with knowledge of facts entitling it to avoid or forfeit a policy accepts and retains a premium, it recognizes the continuing existence of the policy and is precluded from asserting a forfeiture, 37 C. J. 536, § 269. The rule applies where the insurer has information which, if pursued with reasonable diligence, would lead to a dis-

covery of the true facts as to the health of the insured or other matters asserted as grounds of forfeiture. 37 C. J. 535, § 267; *O'Rourke* v. *John Hancock Ins. Co., supra.*

The "M.I.B." card informed the defendant that the written application contained false representations, and, as we have seen, the jury were justified in finding that an inquiry pursued with reasonable diligence would have disclosed full knowledge concerning the insured's health and bodily condition. With this information in its possession and with the knowledge which it imparted, the defendant elected to receive and retain not only the first premium which put the policies in force, but also subsequent premiums to the date of insured's death. The defendant thereby recognized the continuing existence of the policies and by its conduct led the insured to believe until his death that he held valid and subsisting contracts of insurance. It could not with full knowledge of the facts, either actual or imputed, treat the policies as in force during the lifetime of the insured for the purpose of collecting premiums, and now after his death treat them as invalid for the purpose of avoiding payment of the loss. It would be estopped by its conduct from asserting such a forfeiture. The issue of waiver or estoppel was a jury question, and the defendant's motion for a directed verdict was properly denied.

The verdict was general and, under the instructions, it may have been based upon a finding by the jury that there was no fraud by the insured in obtaining the insurance, and without consideration by them of the issue of estoppel from asserting the fraud by defendant's knowledge, actual or imputed, acquired by the "M.I.B." card.

Since we hold that the defendant was entitled to binding instructions on the issue of fraud, the failure to give them was harmful error, and requires a reversal. *Mount Ida School, Inc.* v. *Gilman,* 97 Vt. 331, 335, 123 Atl. 198.

The defendant saved numerous exceptions to the charge of the court on the issue of fraud, but, as the case must be reversed on other grounds, it is not necessary to discuss those exceptions. The same questions are fully covered by our discussion of the exceptions to the overruling of defendant's motion for a verdict. Likewise, other exceptions briefed are sufficiently disposed of without further or more specific attention.

*Judgment reversed, and cause remanded.*