ANTONIA PELLON ET AL. *v.* CONNECTICUT GENERAL LIFE INSURANCE COMPANY (Two Cases).

November Term, 1934.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and SHERBURNE, JJ.

Opinion filed January 3, 1935.

130

*George B. Young* and *J. Ward Carver* for the defendant.

*Theriault & Hunt* for the plaintiff.

SHERBURNE, J.  These cases have been here before, see 105 Vt. 508, 168 Atl. 701, and again come here upon defendant's exceptions after verdict and judgment for the plaintiffs.  They are actions upon two life insurance policies on the life of Venerando Paz.  The defense was fraud on the part of the insured in procuring the policies.  The plaintiffs denied the charge of fraud, and they alleged and claimed a waiver by defendant of any forfeiture and that the defendant was estopped from claiming one.

After the evidence was all in, defendant moved for a directed verdict upon the ground of fraud, and upon the further grounds: ''That on the undisputed evidence no facts appear which charge this defendant with knowledge of any of the misrepresentations in the application; the M. I. B. card reading 'High pulse rate and consumptive tendency' had no tendency to establish or give notice to the defendant that Mr. Paz had, or had been told that he had, tuberculosis of any organ, chronic cough or expectoration, or any disease of the lungs or throat, or had had positive sputum tests, or had had medical advice during the past five years, or that he had a family physician, or

was not in good health at the time of the application for this insurance, Part II, and there could be no waiver by the defendant without actual or imputed knowledge of those facts, and no such knowledge came to its attention and no such knowledge was imputed to it." And "That on the uncontradicted evidence reasonable inquiry would not disclose any of the misrepresentations complained of, and that on the uncontradicted evidence tracing the information contained on the M. I. B. card to the source of information thereon does not disclose any of the misrepresentations which we now claim." The court overruled the motion and allowed exceptions on each and every ground thereof; and, following our former opinion that the plaintiffs were bound by the questions and answers appearing in the written application, and that the insured, at the time he signed the application, had tuberculosis, and he knew it, and that his misrepresentations in the application were material to the risk and induced the contract, the court ruled that "it was a fraud as a matter of law," and only submitted to the jury the issue of waiver or estoppel.

The facts shown upon the issue of fraud are substantially like those detailed in our former opinion and need not be set forth again. As the facts shown upon the issue of waiver or estoppel are substantially different from those shown at the former trial, we mention all facts that appear to be material, although we may be repeating in large part what already appears in the former opinion.

Part II of the application was signed by the insured on October 7, 1929, and he was examined by defendant's medical examiner on that date. The policies were dated October 14, 1929, but were not sent out of the home office of the defendant until October 25. The first premium was paid by the insured on December 14, 1929, the last day the policies could be put into force. The charge of fraud alleged against insured and relied upon in defense is based upon the following questions and answers in Part II of the application:

"7. Have you at any time had or been told that you had (b) asthma, tuberculosis of any organ, spitting of blood, chronic bronchitis, chronic cough or expectoration, pleurisy, pneumonia, palpitation or any disease of the heart, lungs, or throat?" Answer: "No."

"8. (a) Have you had medical advice during the last five years? If so, for what ailments, duration and approximate dates? Give names and addresses of all physicians consulted." Answer: "No."

"8. (b) Name of family physician." Answer: "None."

"9. Are you now in good health? Answer: "Yes."

The result of the physical examination showed a loss in weight of three pounds over the past year, the cause of which was ascribed to the recent death of insurer's wife, a systolic blood pressure of 120 and a pulse rate of 80. The examiner reported that the respiratory murmur was clear and distinct over every part of both lungs and that the lungs were free from every indication of disease, and stated that in his opinion the risk was first class, and recommended its acceptance.

There is an inspection service used by most of the leading insurance companies which the defendant had found to be reliable. Before this application was approved, a report had been procured from the company rendering this service. This report stated that the applicant was a very healthy man and a desirable insurance risk, that it learned of no illness, past or present, that might affect the risk, nor heard of the applicant or any of his family having had consumption. It also stated that his general reputation as to character and morals was good.

On October 14, 1929, insured signed an application to The Mutual Life Insurance Company of New York for a $10,000 policy in that company. He was examined on that date by Dr. W. R. Harkness, its medical examiner. In this application there were questions of similar import to those in the application to the defendant above quoted, and similar answers were given by insured. Dr. Harkness found a systolic blood pressure of 110 and a pulse rate of 110. In reply to the question: "Do careful inquiry and thorough physical examination show any indication of past or present disease or functional disturbance of the heart, arteries, respiratory organs?" he answered "No" to each. In reply to the question: "Do you know of anything in connection with the insured's physical condition, family history or past health record not already recorded, which would affect

his insurability?" he answered: "No." With his report of this examination Dr. Harkness sent to the company a letter reading as follows: "On examination of Mr. Paz, this afternoon, he appeared somewhat lighter than when I examined him three years ago and while my examination brought out nothing definite, I could not help thinking there might be a tubercular condition developing. His rather high pulse and low systolic made it rather of a suspicious case." The Mutual Life Insurance Company rejected this application.

There is a bureau through which information relative to rejected applicants is communicated to life insurance companies which subscribe to the service. On October 24, 1929, the Mutual. Life Insurance Company reported in code to this bureau relative to Mr. Paz that he had a rapid pulse and consumptive tendency, the only basis for which was Dr. Harkness' examination and letter. On October 28, 1929, the defendant received from this bureau a card in code, called in the record an "M. I. B." card, which gave the information communicated to it as above. The card was handled by one of twenty-five clerks in the records department of the home office. It was the duty of this clerk to minute the receipt of the card on the file mark or work sheet pertaining to the insured, and then file the card in alphabetical order in the records department, where such cards were kept on file. Through error, the notation was not made on the file mark, but the card was kept and filed in its proper place. Although the information conveyed by the card did not come to the attention of any of the defendant's officers, whose duty it was to issue policies or pass upon risks, until a few days before the former trial, we have held that the defendant will be presumed to have knowledge of its contents, 105 Vt. at page 521, 168 Atl. 701. It is unnecessary to determine if this card accurately described the condition found by Dr. Harkness, as it is obvious that the defendant cannot be presumed to have had more information from it than was furnished by Dr. Harkness to the Mutual Life Insurance Company. At the time the card was received at the home office of the defendant the policies had been sent to an agent for delivery to the insured; but by their terms they were not in force because the first premium had not been paid. The policies on November 8, 1929, were in defendant's possession at its home office for the purpose of change of bene-

ficiaries. Premiums were paid by the insured, and accepted by the defendant to the date of his death.

The defendant's lay underwriter, who approved this application, testified that if he had had the information conveyed by the card on October 25, 1929, the day the policies were sent out, he would not have passed the insurance but would have referred it to the medical department. Dr. Robinson, defendant's medical director, called and examined as a witness for the plaintiffs, testified on direct that had the application for this insurance, Part II which includes the questions asked of the insured by the medical examiner and the medical examination, come along to him from the lay underwriter, and in addition to the information set out in the application there had been any indication that Mr. Paz had been found by some other company at approximately the time of the application to have been suspected of a consumptive tendency, he would not have approved pending investigation of the suspicion, and would have investigated; but, if the policies had been sent out before the information was received, he would have done nothing and would not have investigated. Later, upon cross-examination, he testified that if he had also had the inspection report above referred to, upon which he found nothing unfavorable, he would have approved the risk, and, if the policies had been issued, would have allowed the insurance to stand as issued. He further testified that, although a rapid pulse rate may have something to do with tuberculosis, and that is one reason why it is taken, he would have attached no significance to it in this case, as the report of their medical examiner showed a pulse rate of only 80, and there are so many things that may cause a rapid pulse, such as nervousness and excitement. He also testified that a low systolic blood pressure has no relation in itself to tubercular trouble, although it may exist with other things; that a high pulse rate and low systolic as reported by Dr. Harkness have no significance under the circumstances. He testified further that the selection of risks is a matter of judgment within certain limits, that one medical department would approve a man where another would not.

Dr. Bisson of Montpelier, called by plaintiffs, testified that a high pulse rate usually goes with tuberculosis. Upon cross-examination he testified that, if on October 7, an examination showed a pulse rate of 80, and a week later an examination

showed a pulse rate of 110, and after a very thorough examination of all the respiratory organs and a good thorough physical examination showing that everything about the man was in first-class condition except the pulse rate, he would not have thought he had tuberculosis and would not have thought it necessary to examine further; but upon redirect testified that if he learned that an examination by a competent practitioner indicated to such practitioner that the patient was developing a tubercular condition, he would have proceeded further.

Dr. Harkness, called by plaintiffs, testified that "a pulse rate of 110 in an examination carries considerable significance; in fact it is very high, and that would be—the first condition brought to his attention would be a tubercular condition," and he "would follow it up with a more complete examination. Of course that carries on a high temperature, chest stethoscope findings and digestion, loss of weight, and all the many irregularities and symptoms that go with that condition, and finally sputum testing, with the X-ray." He went over him with the stethoscope and didn't get any chest symptoms consistent with T. B. finding. He testified that he had known a man to have a pulse rate as high as 110 and not have tuberculosis, that a good many causes might produce it, that it is sometimes produced by nervousness or excitement; that his letter did not indicate that Paz was not an insurable risk, but that while he couldn't find anything definite, he was suspicious of a tubercular condition; that his suspicion was based upon three things, the pulse, low systolic, and loss in weight. That the normal systolic for a man of Paz's then age is 135, and he would consider anything below 120-125 as an indication of bad health. He didn't remember and had no record of Paz's loss in weight, and in reply to a question if there had been a loss of three or four pounds within a few months, where a man had been through the serious illness of his wife, resulting in her death, would that be surprising, answered that he didn't consider three or four pounds any loss of weight.

■■ Under the foregoing circumstances did the defendant have information which, if pursued with reasonable diligence, would have led to a discovery of the true facts, according to the rule stated in our former opinion? The knowledge of the person whose acts are relied on to establish a waiver or estoppel must be of essential facts necessary to enable a person of ordi-

nary prudence and judgment to act understandingly, and it must be knowledge as distinguished from mere inference. 32 C. J. 1322; *Cable* v. *U. S. Life Ins. Co.*, 111 Fed. 19, 49 C. C. A. 216; *Life & Casualty Ins. Co.* v. *King*, 137 Tenn. 685, 195 S. W. 585; *Germania Life Ins. Co. of N. Y.* v. *Lauer*, 123 Ky. 727, 97 S. W. 363.

Dr. Harkness' letter and examination of the insured did not show that he had tuberculosis or that he was not an insurable risk. They merely showed a suspicion that a tubercular condition might be developing. The policies had been issued, although not in force. As defendant's medical director testified, the selection of risks is a matter of judgment within certain limits. He was plaintiffs' witness and was held not to be hostile. Under the circumstances the defendant would have allowed the insurance to stand as issued, knowing that the insured was suspected by one doctor of having a tubercular condition developing, in view of the other favorable information it had available; but it is manifest that it would not have accepted the premiums if it had known the actual condition of the insured and that his statements in the application were false.

Until the defendant saw the death certificate and learned who the attending physician was and called upon him, it had no actual knowledge that the insured had had tuberculosis, or that he had had a family physician, or had consulted doctors within five years before his application for insurance, or had spit blood, or had been told that he had tuberculosis. From then on the proof unraveled, as a starting point had been found. Had the defendant gone directly to Dr. Harkness, it would not have learned of the falsity of these representations. Furthermore, nearly all of the acquaintances and relatives produced at the trial testified to the ability of the insured to do hard manual labor and to his appearance of apparent good health up to a few days before his death. Reasonable diligence did not require going back of Dr. Harkness' examination and letter to make a canvass of the physicians in so large and populous a territory or to test insured's sputum.

We hold that the plaintiffs have not shown that the defendant had information which, if pursued with reasonable diligence, would have led to a discovery of the true facts and of the falsity of insured's representations.

138

■ In arriving at our conclusion we have adhered to our practice that a decision in a case by a. court of last resort is the law of that case on the points presented throughout all the subsequent proceedings therein, and no question then necessarily involved and decided will be reconsidered by the court in the same case on a state of facts not different in legal effect. *Barclay* v. *Wetmore & Morse Granite Co.*, 94 Vt.. 227, 230, 110 Atl. 1, and cases cited. However stringent may be the practice in refusing to reconsider what has been done, it still is but practice, not want of jurisdiction, that makes the rule. If we should become satisfied that we had made a mistake we have power to reopen and reconsider a matter. *Remington* v. *Central Pacific Railroad Co.*, 198 U. S. 95, 100, 49 L. ed. 959, 963, 25 Sup. Ct. 577.

A comparison with our former opinion shows a substantial difference in the facts at the last trial from those of the first trial. Certain conclusions which are stated in our former opinion, although sustained by the evidence at the first trial, are not borne out by the evidence at the last trial. On page 521 of 105 Vt., 168 Atl. 701, 707, we state that the "M. I. B." "card clearly indicates that the representations of the insured were not complete and true, and, in view of the nature of the contract, it was sufficient to put the defendant upon inquiry." Again on page 523 of 105 Vt., 168 Atl. 701, 707, "The 'M. I. B.' card informed the defendant that the written application contained false representations." At the first trial these conclusions were borne out by the testimony of Dr. Robinson. The application of insured to the Mutual Life Insurance Company with his answers therein and the report and letter of Dr. Harkness were not then in evidence. Dr. Robinson did not so testify at the last trial and there was no evidence to that effect.

The plaintiffs complain of inadequate briefing on the part of the defendant. It is true that defendant's brief may be properly criticised in some respects, particularly in arrangement, but we think that it is adequate to cover the matters discussed by us.

For the reasons stated defendant's motion should have been granted. This disposition of the cases makes it unnecessary to discuss the other exceptions.

*Judgment reversed, and judgment for the defendant to recover its costs in each case.*

## On Motion for Reargument.[*]

Sherburne, J. On leave, duly obtained, counsel for the plaintiffs have filed a motion for reargument in these cases, pending which the entry of judgment has been withheld.

For a better understanding of the motion we first quote from our opinion as follows: "A comparison with our former opinion shows a substantial difference in the facts at the last trial from those of the first trial. Certain conclusions which are stated in our former opinion, although sustained by the evidence at the first trial, are not borne out by the evidence at the last trial. On page 521 of 105 Vt., 168 Atl. 701, 707, we state that the 'M. I. B.' 'card clearly indicates that the representations of the insured were not complete and true, and in view of the nature of the contract, it was sufficient to put the defendant upon inquiry.' Again on page 523 of 105 Vt., 168 Atl. 701, 707, 'the "M. I. B." card informed the defendant that the written application contained false representations.' At the first trial these conclusions were borne out by the testimony of Dr. Robinson. The application of insured to the Mutual Life Insurance Company with his answers therein and the report and letter of Dr. Harkness were not then in evidence. Dr. Robinson did not so testify at the last trial and there was no evidence to that effect."

Plaintiffs say that, although avowing our adherence to the law of the case, we have reached our decision by a differentiation of the evidence at the two trials in respects not changing the legal effect of the "M. I. B." card as determined at the former trial, and have thus reached a result amounting to a complete departure from the law of the case. They refer particularly to the testimony of Dr. Robinson as to what he would or would not have done had he known of the card and its background, as recited in the opinion. Overlooking the claim to the contrary in the last complete paragraph on page 19 of defendant's brief, they say that "Such differentiation was not claimed nor argued by the defendant at the hearing, nor was it to be anticipated by the plaintiffs." They set forth fifteen subordinate grounds of the motion under this heading.

First, they say that we have not recited any evidence of Dr. Robinson or of any other witness that will change in legal effect

---

[*]Opinion on motion for reargument filed May 7, 1935.

the indicative or informative office of the card or the background of the card. In the second, third, fourth, and fifth subordinate grounds, they say that we have overlooked the facts that the indicative and informative effect of the card cannot be any other or different at this trial than it was at the other trial, and that if the card at the first trial clearly indicated that the insured's representations were not complete and true and informed the defendant that the written application contained false representations, as we formerly held, it indicated the same thing and gave the same information at this trial, unaffected by what any officer or agent of the defendant may say he would or would not have done if he had known about it; that we have overlooked what we said in the former opinion that "the card clearly indicates that the representations of the insured were not complete and true, and that the card informed the defendant that the written application contained false representation," which is none the less true now that the basis of the card appears; that such basis, in a greater degree than the card itself, has the same indication and furnishes the same information; that there is nothing, and can be nothing, in the testimony of Dr. Robinson as to what he would or would not do, that can affect the indicative or informative force of the card or of what lay back of it; and that while Dr. Robinson's testimony at the former trial was held to be of a character that "leaves no room for doubt" as to putting the defendant on inquiry, his testimony here as to what he would or would not have done, even if different, could not as a matter of law make that force different in its legal effect; they say that the decision appears to rest upon some supposed material difference in the testimony of Dr. Robinson as to what he would or would not have done if he had had the information upon which the card was based, but that we have overlooked the fact that what Dr. Robinson would or would not have done, while a subject proper to be proved, was not determinative of the question of the knowledge imputable to the defendant, and that his testimony here, if different from his testimony at the first trial, in this regard, could not effect a change in the legal effect of the card, and its background; and they further say that we have overlooked the fact that whatever Dr. Robinson says he would or would not have done, the determinative factors are what would constitute reasonable inquiry and what facts as to insured's health would have

been disclosed by reasonable diligence in prosecuting its inquiry, both of which questions we formerly held were for the jury, yet now hold, upon evidence of greater significance than the card alone, that such questions are not for the jury.

We agree with the plaintiffs that the indicative and informative effect of the "M. I. B." card, standing alone, cannot be any other or different at this trial than it was at the former trial, and that it cannot be affected by what any officer or agent of the defendant may say he would or would not have done if he had known about it. But the evidence at the second trial, which was not produced at the first trial, which disclosed the basis of the statement "consumptive tendency" in the card, deprives the card of the indicative force given to it in the former opinion that it informed the defendant that the written application contained false representations, as a suspicion that "there might be a tubercular condition developing" does not support the statement "consumptive tendency." We also agree that irrespective of what Dr. Robinson says he would or would not have done, the determinative factors are what would constitute reasonable inquiry and what facts as to insured's health would have been disclosed to the defendant by reasonable diligence in prosecuting its inquiry.

That a reasonable inquiry required an investigation as to the facts upon which the information in the "M. I. B." card was based may be admitted. If such an investigation had been made the following facts, which we repeat for clarity, would have appeared from evidence that was not produced at the former trial.

On October 14, 1929, insured signed an application to the Mutual Life Insurance Company of New York for a $10,000 policy in that company. He was examined on that date by Dr. W. R. Harkness, its medical examiner. In this application there were questions of similar import to those in the application to the defendant quoted in the opinion, and similar answers were given by insured. Dr. Harkness found a systolic blood pressure of 110 and a pulse rate of 110. In reply to the question: "Do careful inquiry and thorough physical examination show any indication of past or present disease or functional disturbance of the heart, arteries, respiratory organs?" he answered: "No" to each. In reply to the question: "Do you know of anything in connection with the insured's physical

condition, family history or past health record not already recorded, which would affect his insurability?" he answered: "No." With his report of this examination Dr. Harkness sent to the company a letter reading as follows: "On examination of Mr. Paz this afternoon, he appeared somewhat lighter than when I examined him three years ago and while my examination brought out nothing definite, I could not help thinking there might be a tubercular condition developing. His rather high pulse and low systolic made it rather of a suspicious case." At the trial Dr. Harkness testified that this letter did not indicate that Paz was not an insurable risk.

These facts are not contradicted by the plaintiffs. So far as it appears from the evidence produced at the second trial, they are the only facts that a reasonable investigation would have produced.

When the case was here before, there was no certainty what facts would have been produced if there had been a reasonable inquiry by the defendant, and we held that, from the facts which were produced at the trial and from other circumstances shown in evidence, the jury might find that the defendant was estopped from asserting a forfeiture. But all the facts and circumstances which a reasonable inquiry would have produced were brought out in the second trial, and, as the facts are not disputed, the question whether such facts charge the defendant with knowledge of the false representations of the insured in the written application is for the court. *Cummings* v. *Connecticut General Life Ins. Co.*, 102 Vt. 351, 362, 148 Atl. 484.

In the sixth subordinate ground plaintiffs say that we have overlooked the facts that the difference in Dr. Robinson's testimony did not change the legal effect of the evidence as to the force of the "M. I. B." card; that at the former trial he testified that if he had had the information conveyed by the card, he would not have approved the application; that at this trial he testified to the same thing, except that he would not have approved it pending investigation and would have investigated; and that nevertheless the fact that the application had been approved by the underwriting department and these policies had been sent out before the card was received by the defendant appeared in the former trial the same as in this trial. It appears, however, that at this trial Dr. Robinson was per-

mitted to testify as to what he would have done only upon the basis of the information back of the card, not upon what the card itself said, and that he also testified that if he had had the inspection service report, which was not introduced into the evidence at the former trial, he would have approved the risk.

■ As to the seventh subordinate ground, we did not treat the evidence of Dr. Robinson that if the policies had been sent out, he would have done nothing and would not have investigated, as alone controlling and determinative of what the defendant should have done. Cases have to be decided upon the evidence. Dr. Robinson was plaintiff's witness, and so far as his testimony was neither expressly nor impliedly contradicted plaintiffs are bound by it. *Wellman, Admr.* v. *Wales,* 98 Vt. 437, 440, 129 Atl. 317. Plaintiffs refer to defendant's claim as to the capacity in which one Frattini acted. We did not consider this claim.

The eighth, tenth, eleventh, and thirteenth subordinate grounds merely present similar questions to the foregoing and are answered by what we have said. In the ninth subordinate ground plaintiffs say that although avowing our adherence to the law of the case, nevertheless after remanding the case for determination by the jury of what was a reasonable inquiry upon the basis of the ''M. I. B.'' card alone, we have now held that the additional information lying back of the card, together with competent medical testimony of the significance of that information, is not sufficient to make the question of reasonable inquiry for the jury. This amounts to nothing more than the presentation of matters which have already received our careful consideration and have been decided. *Goodwin, Admx.* v. *Gaston et al.,* 103 Vt. 357, 370, 154 Atl. 772; *McAllister* v. *Benjamin,* 96 Vt. 475, 500, 121 Atl. 263.

In the twelfth subordinate ground the plaintiffs say that there was still a question for the jury if the testimony of defendant's underwriters was such as to raise some doubt. It was not such.

In the fourteenth subordinate ground the plaintiffs say that Dr. Robinson's testimony is sufficient to warrant an inference that the defendant was more intent on getting in the premiums and thereby putting the insurance in force than in making an inquiry. We do not think so.

In the fifteenth subordinate ground plaintiffs say that we have not viewed the evidence most favorably to the plaintiffs in arriving at our conclusion, and in the sixth main ground of the motion they point out several instances where they claim we have disregarded the rule whereby they are entitled to have the evidence viewed in the light most favorable to them. We have carefully read all the evidence and have mentioned in the opinion fair quotations from the medical testimony, and in so doing have given the plaintiffs all that they are entitled to under this rule. We could have quoted more extensively, but have had to condense what we had to say within a reasonable length. Although it is much a matter of judgment, we are satisfied that we have covered the matters accurately and in sufficient detail. We overlooked nothing that has been suggested.

In their second main ground of the motion plaintiffs say that we have given no effect, on the question of what was reasonable inquiry, to the knowledge with which, on the issue of forfeiture, the defendant was by law chargeable, namely, the knowledge of its own medical examiner, that is, that none of the answers relied on in the application, purporting to be the answers of the insured, were in fact such, and that the insured was not inquired of, and made no answer, as to tuberculosis. The questions which defendant's medical examiner asked insured, and his answers, were substantially the same as at the former trial, and as given on page 513 of 105 Vt., 168 Atl. 701. Although because of insured's fraud the plaintiffs are bound by the questions and answers appearing in the application, we agree that the defendant was chargeable with the knowledge of its medical examiner, and that this knowledge would have become a factor in case an investigation had been required. We did not overlook this as claimed by the plaintiffs. But assuming, contrary to our holding, that the defendant had information, the basis for which required an investigation, it is improbable that, had the medical examiner been required to seek out the insured and ask the identical questions in the application, he would have gotten any different answers from those already set down or than Dr. Harkness got when he asked substantially similar questions for the Mutual Life Insurance Company. The insured knew that he had tuberculosis, and by concealment of that fact was trying to load up with a large amount of life insurance.

In their third main ground of the motion plaintiffs say that we overlooked the fact that whatever particular answers in the application were false, the fraud of insured lying at the root of the forfeiture rests upon the ultimate fact that he had tuberculosis and concealed it upon examination. A more careful reading of the opinion will not bear this out. The remaining matters mentioned under this ground are disposed of by what we have already said, except that we cannot pass over without comment the misconception of the opinion by plaintiffs' attorneys, when they state that we appear to have adopted certain reasoning by holding in effect that even if the defendant had had in its file the reports of insured's sputum tests from the State Laboratory, instead of the "M. I. B." card, it would yet be rulable as a matter of law that there was no waiver.

In the fourth ground of the motion plaintiffs mention the availability of the records of insured's sputum tests. All that need be said as to this is to ask, why the defendant should have looked these up or have suspected their existence, when it had been told that the insured had not been sick to have a doctor.

In their fifth ground plaintiffs speak of imputed knowledge. There was none here in the respects claimed.

The remaining ground of the motion is sufficiently covered by what we have already pointed out.

*Motion for reargument denied. Let full entry go down.*